BRICK, The (LANE v.). See Case No. 8,048.

BRICKER (UNITED STATES v.). See Case No. 14,642.

BRICKFORD (UNITED STATES v.). See Case No. 14,643.

BRIDDLE (SCULL v.). See Cases Nos. 12,-569 and 12,570.

## Case No. 1,857.

### BRIDGE et al. v. BROWN et al.

[Holmes, 53; Merw. Pat. Inv. 113.] [1]

Circuit Court, D. Massachusetts. April Term, 1871.

PATENTS—REISSUE—CONCLUSIVENESS—EXTENT OF CLAIM.

1. The grant of a reissue of a patent is not conclusive upon the question whether or not it is for the same invention as the original patent.

---

[1] [Reported by Jabez S. Holmes, Esq., and here reprinted by permission. Merw. Pat. Inv. 113, contains only a partial report.]

2. A patent for a new and useful process, which clearly describes the process and the construction of some machinery or apparatus by which it can be carried out, covers all machinery or apparatus which will accomplish the same purpose in substantially the same way.

3. The reissue patent, dated March 28, 1865, granted S. W. Pingree for an improved process for extracting tan bark, held invalid for want of novelty.

Bill in equity [by Abel E. Bridge and others against Rufus H. Brown and others] for an injunction to restrain alleged infringement of reissued letters-patent [No. 1,922], for an improved process for extracting tan bark, granted S. W. Pingree, March 28, 1865; and for an account of profits. The original patent [No. 41,782], was granted to Pingree, March 1, 1864. The complainants were the owners of the reissue for the New England states, by assignment. The defendants contended that the reissue was invalid, because it was not for the same invention as the original patent, and because the patentee was not the original and first inventor of the patented process. [Bill dismissed.]

Thomas L. Wakefield, for complainants.

George L. Roberts, for defendants.

SHEPLEY, Circuit Judge. The reissue patent of S. W. Pingree, dated March 28, 1865, for a new and improved process for extracting tan bark, described his invention as follows:—"This invention is principally based on the use of steam in making extracts from tan bark, and it consists in treating tan bark after it has been ground: first, with weak tan liquor, or water, whereby it is swelled; and, after the first liquor has been drained off, with steam, which penetrates the bark and prepares it for a second percolation with cold water or weak tan liquor, and a second treatment with steam, in such a manner that, by the application of the first lotion, the bark is prepared for the action of the steam, and by the application of the steam the soluble parts contained in the bark are softened, and brought in the best condition to give up their tannin to the second lotion of cold water or weak tan liquor."

This portion of the description seems sufficiently plain and unambiguous. The process described is: First, a drenching with weak tan liquor or water; second, after the liquor has been drained off, exposing the tan bark to the action of steam; third, a second percolation with weak tan liquor or water; fourth, a second treatment with steam; and, as this second treatment of steam, like the first, was only to soften the soluble parts contained in the bark, so as more readily to give up their tannin, this involved, fifth, another percolation of weak tan liquor or water.

He then goes on to describe the apparatus with which he executes his process, which "consists of an ordinary leach tub," "which may be divided into more or less compart-

ments, each of which is provided with a false perforated or slotted bottom." "I cover the leach up with a tightly fitting cover, and admit steam through a pipe which extends over the entire length of the leach. The cover is perforated with a series of holes, which can be closed by slides or other suitable devices, and a pipe (which may be of india-rubber or other flexible material, or of iron) conveys the steam through the holes to the different compartments of the leach." If a flexible pipe is used, it must be provided with a metallic mouth-piece. The mouth-piece of the steam-pipe extends down through the bark nearly to the perforated bottoms of the several compartments, and, when the bark has been thoroughly heated in one compartment, the mouth-piece is passed through another of the holes, and so on until all the bark in the leach has been acted upon by the steam. The leach is again filled with cold water, and allowed to steep for thirty minutes, and then the bark is heated a third (second) time, as before, until the steam reaches the top of the bark, and it is again covered with weak tan liquor. He describes how his process differs from the ordinary process, as follows: "In the ordinary process the liquid is heated with the bark; but in my process the bark alone is heated by the action of the steam, and the liquor is poured on cold."

The claims in the patent are: "First, the within-described process of extracting tan bark by first swelling the bark with water or weak tan liquor, and heating it with steam, and afterwards steeping with cold water or weak tan liquor, substantially in the manner set forth; second, introducing steam into the bark contained in a leach, at different points, through a pipe, in the manner and for the purpose substantially as described."

The validity of the reissued patent is objected to, upon the ground that it is not for the same invention as the original, and therefore void.

The grant of a reissued patent by the commissioner of patents is not conclusive upon the question whether it is for the same invention as the original patent; but wherever it appears, upon the comparison of the two specifications, as a matter of law, that the reissued patent is not for the same invention as that embraced and secured in the original patent, the reissued patent is invalid, and the commissioner has exceeded his jurisdiction in granting it. Allen v. Blunt [Case No. 216]; Battin v. Taggert, 17 How. [58 U. S.] 83; Sickles v. Evans [Case No. 12,839.]

But giving the proper construction to the reissued patent, and treating that as Pingree's invention which is described in both patents as the process invented by him, upon a careful comparison of the reissued patent with the original patent, we are unable to perceive how we can properly determine, as a matter of law, that the reissued patent describes a different invention from that described in the original.

Both specifications describe the invention as consisting substantially in treating tan, by first swelling it in water or weak tanning liquor, and, after that is drained off, by next subjecting it to the action of steam, which prepares it for a second percolation of water or weak tan liquor. The theory of the two patents in respect to the effect of each of these steps in the process is substantially that, by the first drenching, the bark is prepared for the action of the steam, and by the action of the steam the bark is brought into the best condition to yield its tannin to the second lotion. Both patents describe the difference between the old process in use and the invention of Pingree to be, that, "in the ordinary process, the liquid is heated with the bark; but in my process the bark alone is heated, and the liquid is poured on cold." Both specifications describe the same mode of introducing the steam into the tan, so as, by successive applications of the discharge-pipe in different parts of the leach, to heat by steam all the bark. Although, in describing the preliminary process of steeping the bark, the two patents differ in the length of time the bark is steeped before and succeeding the first application of steam, and although the second patent clearly describes a repetition of the process of steam-heating, which is not so clearly indicated, even if implied, in the first patent, we think the same invention substantially is described in both patents.

We now come to the question, whether this process of extracting tannin from bark was new at the time of the alleged invention by the patentee.

What the patentee claimed as new was: First. "The within-described process of extracting tan bark, by first swelling the bark with water or weak tan liquor, and heating it with steam, and afterwards steeping with cold water or weak tan liquor, substantially in the manner set forth." Second. "Introducing steam into the bark contained in a leach, at different points, through a pipe, D, in the manner and for the purpose substantially as described." The "manner" of introduction was to extend a "steam-pipe down through the bark nearly to the perforated bottoms of the several compartments, and, when the bark has been thoroughly heated in one compartment, the mouth-piece is passed through another of the holes" (of the perforated cover) "and so on until all the bark in the leach has been acted upon by the steam." The "purpose" was to submit all the bark to the action of the steam, so as to bring it into condition to yield up the tannin to the lotion of weak tan liquor or water.

It is perfectly clear, that if Pingree's patent is to be construed as claiming as his invention steam-heating the bark apart from the liquor, or steam-heating the bark after it

has been once moistened, and then extracting the tannin by successive drenchings and steam-heatings, it could not be sustained; for such a treatment of the bark by first moistening it, and then steam-heating it, and then drenching it, and by repeating these processes, was in use long before he can claim to have perfected his invention.

He states in his application, that "in the ordinary process the liquid is heated with the bark; but in my process the bark alone is heated, and the liquid is poured on cold."

In the patent granted to William Coburn, of Gardiner, Me., Nov. 1, 1828, an apparatus is described consisting of a cistern or tub furnished with a false bottom perforated with holes, and raised a few inches from the true bottom. "The tub is filled with the substance to be acted upon by the steam, which is suffered to pass into the tub between the two bottoms. Cold water or bark liquor is then occasionally poured into the top of the tub, and the liquor thus obtained is drawn off by means of a cock placed between the bottoms of the tub." He states also: "By the application of cold bark water or liquor, or cold water, the steam is found to penetrate the substance much more easily, and a greater quantity of tannin is obtained." The copy of Coburn's specifications found in the "Journal of the Franklin Institute," (volume 3, p. 129), does not give us the number of steam-heatings, nor the number of intermediate drenchings to which the bark was subjected in this process; but from the fact that cold bark liquor or water was "occasionally" poured in, and drawn off after percolating through the bark, and that intermediately the bark was steam-heated, we have no difficulty in determining that the liquor was poured on cold, and drawn off, and the bark alone heated, and the process repeated one or more times. As the steam was introduced under the false bottom, the water must necessarily be drawn off at intervals, to allow the proper application of the steam to the bark.

The process of Pingree, so far as described in his original patent, consisting of three steps in the process,—First, drenching and draining the bark; second, steam-heating it thoroughly; third, a repetition of the drenching and draining,—clearly was not new; for it had long been in successful and continuous and practical use in Maine, at Gardiner and Waterville, before the fall of 1857 when Pingree claims to have commenced his experiments. The reissued patent of Pingree properly calls for a second steam-heating and subsequent drenching as essential to his process.

The complainant contends that the process covered by the reissued patent contemplates: First. Steeping, swelling, and softening the entire mass of bark in the leach with weak tan liquor or water, and then drawing off the liquor containing the strength thus obtained. Second. Heating the entire mass of bark thus swelled and softened by steam, discharged directly in contact with the bark in the leach top of the false bottom, so that the steam will permeate and heat the entire mass in the leach; penetrating the separate kernels of the bark, and thereby preparing it to yield up its strength or tannin to another percolation of weak tan liquor or water. Third. Again steeping the bark in weak tan liquor or water, and again drawing it off, and continuing the steam-heatings and successive drenchings until the strength is substantially extracted.

If this process or method was new and useful, and if the patentee was the first and original discoverer or inventor of the process, and if it is clearly set forth and described in the specification of his patent, and if he has clearly set out and described in his specification the construction of some machinery or apparatus by which his process can be applied, he entitles himself to cover all machinery or apparatus which will accomplish the same purpose in substantially the same method. Corning v. Burden, 15 How. [56 U. S.] 252; Foote v. Silsby [Case No. 4,919].

For the purpose of considering fairly the question of the originality and priority of invention, we are inclined to adopt this as substantially the true construction of the reissued patent. It is manifest, upon the most cursory examination of the evidence, that upon any broader and less limited construction of the patent, and, in fact, upon any other construction than the one the complainant contends for, the patent would not describe any method or process which had the slightest pretence to novelty. The process of steam-heating the bark after it had been drenched with weak tan liquor or water, apart from the liquor or water, and after that had been drawn off so as to prepare it for a subsequent drenching, was not original with the patentee; nor does the repetition of this process upon the same bark appear to have been a process new and original with him.

In this connection, it becomes important to determine when the patentee may fairly be considered to have perfected his discovery of the process described in the reissued patent, according to the construction of the patent contended for by him.

It is evident that the experiments made by the patentee prior to the year 1863 were all made for the purpose of testing the use of steam-heating, apart from the water or tan liquor, upon the bark, and generally upon bark to which the ordinary process had once been applied. The patentee, at that time, evidently supposed that steam-heating the bark apart from the water or tan liquor was a new process, and was testing its utility. "I made," he says, "previous trials" at various localities, as early as 1857, for the purpose of testing the strength of liquors obtained by the use of steam from bark once

exhausted by the usual process. But a careful examination and comparison of all the evidence in the case satisfies us that he cannot fairly claim to have even tried the process described in his patent, as a whole (giving to the patent the construction for which the complainants contend), before the fall of 1862, or the spring of 1863. Before his employment in the Hoyt's tannery, in the fall of 1862, he had not contrived and put into successful operation any process comprising all the elements of the process described in his patent. He says, "I made some of my first trials at General Sampson's tannery, at Boyceville, Ulster county, New York. That was in the spring of 1863. I went there from the Hoyt's tannery, to which I have already referred." Pingree, also, when asked what he had in view in the spring of 1861, replies, "heating the bark without the water." He also informed Winchester, in the spring of 1861, that he had found that a good liquor could be obtained from bark previously leached, "by applying the steam to the bark without water." But, as we have previously had occasion to remark, there was nothing new in this process. It had long previously been in continuous and successful use. In relation to all the experiments made by Pingree, and testified to by him prior to 1862, in Methuen, and in Salem and Woburn, he says, "I had not a process then. I did not claim a process. I was experimenting then to bring out a process."

The patentee describes the first use of his process, as a whole, precisely according to the complainants' construction of the patent, when he went to the tannery of General Sampson, in Sampsonville, N. Y., in the spring of 1863.

The evidence in the case is conclusive, that a second steam-heating and subsequent drenching of the bark was put into practical operation by the Jarvis Brothers, in their brick leaches at Gardiner, as early as December, 1859; by the Osborns, at their tannery in Peabody, as early as July, 1861; and by Winchester, at Pinder and Brown's old yard, in 1861; and has been in continuous employment ever since. The attempt seems to be to sustain the patent, on the ground that Pingree first combined with the process of repeated drenchings of the bark, alternating with repeated steam-heatings of it, apart from the liquor, a process of introducing the steam in a pipe inserted through apertures in the top or sides of the leach. This mode of introduction of the steam was not new with Pingree. It is fully described in the French patent of Caccia granted April 8, 1824; and it also appears, from the evidence, that this mode of discharging steam through a pipe thrust down into the mass at different places above the false bottom had been long known, and frequently used whenever the steam-pipes permanently attached to a leach had become defective or been obstructed temporarily. In fact, the intro-

duction of steam through a pipe downwards from the top of the mass of bark, or through apertures in the side of the leach, instead of through tubes, holes, or other apertures from the bottom, involved no invention that would support a patent. When the steam was introduced through holes in the false bottom, it first came in contact with the bark top of the false bottom, in substantially the same way and in substantially the same places that it does from the aperture of the pipe extending from the top of the mass of bark down to the top of the false bottom.

I do not see, from the evidence in the case, how the patentee can fairly be considered as having been the first and original inventor of any new process or method of extracting tannin from bark; and therefore, as I do not think, upon the complainant's own construction of his patent, that it can be sustained, or that either of the two claims in the patent are valid, it becomes unnecessary for me to state the conclusions to which I have arrived on the other points presented in the defence. The complainants' bill must be dismissed with costs. Decree accordingly.

[NOTE. For a decree dismissing the bill of the same complainants to restrain an alleged infringement of a patent for an apparatus for use in conjunction with the patented process which was the subject-matter of the litigation herein, see Bridge v. Brown, Case No. 1,858.]